1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

GATEWAY CITY CHURCH, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No.  5:20-cv-08241-EJD

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 47

Plaintiffs Gateway City Church, The Home Church, The Spectrum Church, Orchard Community Church, Trinity Bible Church (collectively "Plaintiffs") brought the present motion for a preliminary injunction against Defendants Gavin Newsom, in his official capacity as Governor of California, Sandra Shewry, M.D., in her official capacity as Acting Director of California Public Department of Health (collectively, "State"), the County of Santa Clara, and Sara H. Cody, M.D., in her official capacity as Santa Clara County Health Officer (collectively "County"), and their agents, employees, attorneys, law enforcement, and those acting in concert (altogether, "Defendants").  Plaintiffs seek to restrain enforcement of certain State and County public health orders that prohibit indoor worship services or restrict the number of people permitted in places of worship as part of the State's and County's efforts to slow the spread of COVID-19.

Plaintiffs' motion requires the Court to balance two competing interests of utmost importance: the public interest in the First Amendment freedom to exercise religion and the public health interest in preventing and protecting against the spread of the unprecedented COVID-19

pandemic.  The stakes are very high; the ever-increasing number of people afflicted by COVID-19 is devasting.  The far-reaching effects of this devastation on the public, in turn, makes communities of faith and spiritual well-being evermore vital.

Courts across the country, including the United States Supreme Court and the Ninth Circuit Court of Appeal, have been weighing these competing interests since the onset of the pandemic, and the case law has evolved alongside our understanding of the virus.  After careful consideration of recent precedent, as well as the parties' briefing, evidentiary submissions, and oral arguments, the Court **GRANTS in part and DENIES in part** Plaintiffs' motion for a preliminary injunction.

I.   **Background**

A.  **COVID-19**

The severe respiratory syndrome coronavirus type-2 known as COVID-19 is now the world's deadliest infectious disease.  It has killed approximately 430,000 Americans, including nearly 40,000 people in California.[1]  Indeed, by some measures, COVID-19 is now the leading cause of death in the United States.  *See* Dkt. No. 52-1, Declaration of Todd Grabarsky (First) In Support Of State Defendants' Opposition ("Grabarsky Decl."), Exs. 58-59.  There is no known cure and only limited treatment options for the disease.  Dkt. No. 52-4, Declaration of George Rutherford, MD, In Support Of State Defendants' Opposition ("Rutherford Decl.") ¶¶ 39-41.  New vaccines promise an eventual end to this crisis, however, they are not yet widely available and cases continue to rise.  At least 706 new coronavirus deaths and 18,628 new cases were reported in California on January 27, 2021, which will further encumber California's already overburdened health care facilities and intensive care units ("ICUs").[2]

---

[1] New York Times, *Coronavirus in the U.S.: Latest Map and Case Count*, available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last updated Jan. 28, 2021); New York Times, *California Coronavirus Map and Case Count*, available at https://www.nytimes.com/interactive/2020/us/california-coronavirus-cases.html (last updated Jan. 28, 2021).

[2] *Id.*

Case No.: 5:20-cv-08241-EJD
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

2

United States District Court
Northern District of California

1    Although much is still unknown about the virus, there is scientific consensus that COVID-

2    19 is transmitted primarily by respiratory droplets containing virus, which are exhaled when

3    individuals breathe, speak, sing, or chant.  Rutherford Decl., ¶¶ 29-34; Dkt. No. 52-3, Declaration

4    of Dr. James Watt, MD, MPH, In Support Of State Defendants' Opposition ("Watt Decl.") ¶¶ 25–

5    28.  It is also widely acknowledged that many people infected with the virus do not experience any

6    symptoms but may nonetheless transmit COVID-19 to others.  *Id.* ¶¶ 30-32; Rutherford Decl. ¶¶

7    32-34.  Not all exposure to the virus will result in infection, rather, epidemiologists have found

8    that "[v]iral load"—the number of "viable viral particles" to which a person is exposed—

9    determines whether the virus will "overcome the body's defenses and cause a COVID 19

10   infection." *Id.* ¶¶ 35-36; *see also* Watt Decl. ¶¶ 33, 44.

11   The risk that the virus will transmit between persons depends on a number of factors,

12   which affect the viral load a person could be exposed to.  These include: how many people are

13   gathered in a single space (the more people, the more likely it is that one or more people are

14   infectious), the physical distance between those people (the closer they are, the more likely it is

15   that respiratory droplets from one person will reach another person), the amount of time those

16   people are in close proximity (the longer the time, the more potentially infectious droplets there

17   will be), and the amount of ventilation in the space (the more air flow, the more likely it is that

18   infectious droplets will dissipate before reaching another person), among others.  *Id.* ¶¶ 37-46.

19   Transmission risk also increases when infected individuals engage in activities such as speaking,

20   singing, or shouting that increase their breathing and, by extension, exhalations.  *Id.* ¶¶ 45-46;

21   Rutherford Decl. ¶¶ 75, 95-100.

22   Transmission risk may be reduced, but not eliminated, by precautions such as wearing a

23   face mask over the nose and mouth and maintaining a distance of at least six feet from individuals

24   of other households.  *Id.* ¶ 75; Watt Decl. ¶¶ 47–53.  In order to reduce the risk of transmission

25   and stem the spread of COVID-19, a wide variety of restrictions have been imposed at the local,

26   state, and federal level across the country, including the restrictions at issue in this case.

27   Case No.: 5:20-cv-08241-EJD

28   ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
     PRELIMINARY INJUNCTION

1

**B.  Procedural History**

Plaintiffs filed their original complaint on November 23, 2020, followed soon after by an *ex parte* application for a temporary restraining order.  Dkt. Nos. 1, 13.  On December 2, 2020, this Court issued an order denying the application for a temporary restraining order without prejudice and setting a status conference to discuss the substantive and procedural impact of similar cases then-pending before the Supreme Court.  The relevant cases were resolved before the status conference and the Court then set a schedule to proceed with Plaintiffs' preliminary injunction motion.  The Court also expressed some doubt about Plaintiffs' standing to challenge past orders which were no longer in effect and permitted Plaintiffs to file an amended complaint and motion focusing solely on the operative State and County orders.

On December 9, 2020, Plaintiffs filed an Amended Complaint.  Dkt. No. 40.  The Amended Complaint asserts six claims under 42 U.S.C. § 1983: (1) violation of the First Amendment freedom of assembly; (2) violation of the First Amendment Free Exercise Clause; (3) violation of the right to equal protection under the First Amendment; (4) violation of the First Amendment freedom of speech; (5) unreasonable seizure of property in violation of the Fourth Amendment; and (6) violation of the Fourteenth Amendment "privileges and immunities" clause.  Plaintiffs also assert a seventh claim for declaratory relief.  Alongside the Amended Complaint, Plaintiffs filed 159 exhibits (Dkt. Nos. 41-46), a Motion for Preliminary Injunction (Dkt. No. 47, "Motion") and 25 declarations from Plaintiffs' pastors and other church personnel in support of that motion (Dkt. No. 50).

On December 23, 2020, the State and the County filed separate responses to the Motion.  Dkt. No. 52 ("State Opp."); Dkt. No. 53 ("County Opp.").  The County attached exhibits A-S, and the State attached exhibits 1-64, many of which overlap with Plaintiffs' exhibits.  Defendants also filed multiple declarations, including the expert declarations of Dr. Watt and Dr. Rutherford, whose qualifications and expertise in epidemiology and public health are undisputed.  On December 30, 2020, Plaintiffs filed a Reply (Dkt. No. 55) accompanied by 5 supplemental

United States District Court
Northern District of California

United States District Court
Northern District of California

declarations and 19 additional exhibits (exhibits 159-175).

Plaintiffs also filed objections to the Declaration of the Health Officer for the County of Santa Clara Sara H. Cody ("Cody Declaration") and the Declaration of Dr. Marc Lipsitch ("Lipsitch Declaration"). Dkt. No. 55-7. Specifically, Plaintiffs objected to Dr. Cody's statements about the relative transmission risks of shopping and attending worship services, and her rejection of Plaintiffs' categorical assertions that they have not contributed to the spread of COVID-19. *See, e.g.*, Cody Decl. ¶ 64 (refuting Plaintiffs' assertion that they have not contributed to the spread because "we know that persons who are asymptomatic, but infected, can spread the SARS-CoV-2 infection to others—meaning that a person could become infected by SARS-CoV-2 at a worship service held indoors, remain asymptomatic, and unknowingly transmit the infection to persons who may have never set foot into any of the place of worship's facilities."). Plaintiffs also object to both Dr. Cody's and Dr. Lipsitch's statements about Plaintiffs' failure to comply with county health orders at past indoor worship services. For the reasons stated at the preliminary injunction hearing held January 15, 2021, the Court overrules Plaintiffs' objections.[3]

### C. Challenged Orders

Plaintiffs' Motion for Preliminary Injunction specifically seeks to enjoin the State and County's enforcement of four interrelated public health orders.

---

[3]    The Federal Rules of Evidence do not strictly apply to preliminary injunction proceedings. *See Houdini Inc. v. Goody Baskets LLC*, 166 F. App'x 946, 947 (9th Cir. 2006) ("the district court did not abuse its discretion in considering hearsay and biased evidence . . . because the rules of evidence do not strictly apply to preliminary injunction proceedings.") (citing *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). This flexibility exists because "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination" and makes it difficult for a party to procure supporting evidence in a form that would be admissible at trial. *Id.* "While district courts may consider inadmissible evidence in the context of a preliminary injunction, this does not mean that evidentiary issues have no relevance to this proceeding. Such issues, however, properly go to weight rather than admissibility." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848 (9th Cir. 2017) (quoting *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1185 (C.D. Cal. 2015), *aff'd*, 834 F.3d 958 (9th Cir. 2016)).

United States District Court
Northern District of California

### i.    The Blueprint

The California Department of Public Health ("CDPH") Statewide Public Health Officer Order dated August 28, 2020, known as the Blueprint for a Safer Economy ("Blueprint") is a framework of risk tiers and sector-specific restrictions, applied and periodically adjusted county-by-county through the State.  Plaintiffs' Exs. 25-27.  Counties are assigned tiers ranging from "Tier 1-Widespread" to "Tier 4-Minimal" based on testing positivity and "case rate," defined as rate of new Covid-19 infection per capita, excluding prison cases, on a seven-day average.  Tier 1 restrictions are the most severe.  In counties designated Tier 1, social gatherings (predominately but not exclusively secular) are only permitted outdoors and may only consist of up to three households.  Shopping centers and all retail may operate at a maximum of 25% capacity but must close common areas and food courts.  Museums, zoos, movie theaters, gyms, restaurants, wineries, cardrooms, family entertainment centers (which include batting cages and mini golf), and importantly, "places of worship" are permitted to operate outdoors only.

In Tier 2 social gatherings are "strongly discouraged" but permitted indoors and may consist of up to three households.  Retail and shopping centers may open indoors at 50% capacity.  Places of worship, movie theaters, and restaurants may open at 25% capacity or up to 100 people, whichever is fewer.  In Tier 3, retail and shopping centers may open "with modifications" but without capacity restrictions, while places of worship may open indoors at 50% capacity or 200 people, whichever is fewer.  Regardless of Tier, the Blueprint permits "critical infrastructure," including airports, to open with modifications.

### ii.    State Regional Order

Issued on December 3, 2020, the State Regional Stay at Home Order (Plaintiffs' Ex. 144) ("Regional Order," together with the Blueprint, "State Orders") imposes further restrictions on top of the Blueprint.  This order goes into effect automatically the day after a region has been announced to have less than 15% availability in its hospital Intensive Care Units ("ICUs").  The Regional Order prohibits all gatherings with members of other households, both indoor and

outdoor, but makes an exception for outdoor worship and political expression.  In other words, worship services are subject to the Blueprint's Tier 1 restrictions, even in a county where the Regional Order is in effect.

At the time of the preliminary injunction hearing on January 15, 2021, the Regional Order was in effect in three of the five regions in the state, including that Bay Area region.  On January 25, 2021, the State lifted the Regional Order completely, as projected ICU availability over 4 weeks in all regions rose to over 15%.  Once a region exited the Regional Stay Home Order, counties within that region returned to the applicable tier and rules under the Blueprint.  Because the Regional Order could go back into effect if ICU capacity falls again, the Court considers this order even though it is not currently in effect.

### iii.    The Capacity Directive

The Santa Clara County Capacity Limitations Directive (December 4, 2020) (Plaintiffs' Ex. 159) ("Capacity Directive") was issued November 15, 2020 and was most recently revised January 25, 2021.  It establishes capacities for various sectors and activities based on their risk profiles and reflects the rules in the County's various Mandatory Directives as well as the State's Blueprint and other orders.  For example, the Capacity Directive provides indoor and outdoor limitations for a number of businesses and activity types, including retail stores (20% capacity indoor), gyms, bars, restaurants, and museums (all prohibited indoor), among others.

The Capacity Directive has been modified since Plaintiffs submitted their motion and supporting exhibits.  Whereas the version Plaintiffs submitted had one column capacity limitations generally, the current version splits the capacity limitations into two columns: "indoor" and "outdoor."  The current version indicates that "Gatherings (e.g., political events, weddings, funerals, worship services, movie showings, cardroom operations)" are "prohibited" indoors and outdoors are "[a]llowed up to 200 people per gathering, but subject to the limitations set forth by the State, which generally prohibit all gatherings except religious services, cultural ceremonies, political protests, other gatherings allowed by a State guidance document, and outdoor gatherings

United States District Court
Northern District of California

1   of up to 3 households." *See* Mandatory Directive on Capacity Limitations, revised and effective

2   January 25, 2021, available at https://www.sccgov.org/sites/covid19/Documents/Mandatory-

3   Directives-Capacity-Limitations.pdf ("Revised Capacity Directive").  These revisions do not

4   impact the Court's analysis.

5              **iv.   The County Regional Stay At Home Order**

6              The County Regional Stay At Home Order (December 3, 2020) (Plaintiffs' Ex. 150-1;

7   Kieschnick Ex. L) (together with the Capacity Directive, the "County Orders") operates to

8   implement the State's Regional Order on a faster timeline.  Based on local data that ICU capacity

9   had already fallen below 15% and considering the lag between infection and hospitalization, the

10  County Health Officer determined it was necessary to implement the stricter Stay At Home

11  restrictions on December 6, 2020.  Ultimately, the State's Regional Order was triggered for the

12  entire Bay Area on December 16, 2020 when ICU capacity fell to 12.9%.

13             Also relevant to Plaintiffs' claims is the County Mandatory Directive for Gatherings,

14  which was first issued July 14, 2020.  Kieschnick Ex. J at 1 ("Gatherings Directive").  The

15  Gatherings Directive applies to any "event . . . that brings together multiple people from separate

16  households in a single space . . . in a coordinated fashion."  The directive applies regardless of

17  whether the event has a religious or secular purpose, such as a wedding, conference, religious

18  service, festival, performance, political event, protest, or sporting event.  Plaintiffs do not

19  specifically challenge this order, but it is key to understanding the other County Orders'

20  restrictions on gatherings.

21             **D.  Recent Precedent**

22             Courts have been struggling with the questions presented in Plaintiffs' Motion since

23  shortly after the pandemic began.  As Defendants point out, up until the Supreme Court's decision

24  in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), every federal court to

25  consider challenges to California's limits on worship services found the challenges unlikely to

26

27  Case No.: 5:20-cv-08241-EJD

28  ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
    PRELIMINARY INJUNCTION

8

1  succeed.[4]  The legal landscape, however, has evolved since *Roman Catholic Diocese* and the few

2  cases that have followed it, all of which inform the Court's analysis in this case.

3            **i.**     ***Roman Catholic Diocese of Brooklyn v. Cuomo***

4         In *Roman Catholic Diocese*, two houses of worship sought an injunction from the Supreme

5  Court pending their appeal in the Second Circuit, seeking relief from an New York Executive

6  Order aimed at stemming the spread of COVID-19 in the state ("New York Order").  *Roman*

7  *Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020).  The New York Order imposed

8  restrictions on attendance at religious services in areas classified as "red" or "orange" zones.  In

9  red zones, religious service attendance was capped at 10 people, and in orange zones, it was

10  capped at 25.  *Id.* at 66.  In both zones, however, the order provided that essential businesses could

11  "admit as many people as they wish[ed]."  *Id.*  The Court noted that "acupuncture facilities, camp

12  grounds, garages, . . . plants manufacturing chemicals and microelectronics[,] and all

13  transportation facilities" were considered "essential."  *Id.*  Moreover, in orange zones, even "non-

14  essential businesses [could] decide for themselves how many persons to admit."  *Id.*

15         The Supreme Court held that the New York Order, "violate[d] 'the minimum requirement

16  of neutrality' to religion."  *Id.* (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,

17  508 U.S. 520, 533, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993)).  Under the Court's reasoning, the

18  New York Order was not neutral because it "single[d] out houses of worship for especially harsh

19

20  _____

21  [4] *See e.g., S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 207 L. Ed. 2d 154 (2020); *Harvest Rock Church, Inc. v. Newsom*, 977 F.3d 728 (9th Cir.), *vacated on denial of reh'g*

22  *en banc*, 981 F.3d 764 (9th Cir. 2020); *South Bay United Pentecostal Church v. Newsom*, 959 F.3d 938 (9th Cir. 2020); *South Bay United Pentecostal Church v. Newsom*, No. 20-CV-00865-BAS-

23  AHG, 2020 WL 6081733 (S.D. Cal. Oct. 15, 2020), *vacated and remanded*, 981 F.3d 765 (9th Cir. 2020); *Harvest Rock Church v. Newsom*, 2020 WL 5265564 (C.D. Cal. Sept. 2, 2020), *vacated*,

24  2020 WL 7061630; *Ministries v. Newsom*, 465 F. Supp. 3d 1068 (S.D. Cal. 2020); *Cross Culture Christian Ctr. v. Newsom*, 445 F. Supp. 3d 758 (E.D. Cal. 2020), *appeal dismissed*, No. 20-15977,

25  2020 WL 4813748 (9th Cir. May 29, 2020); *Gish v. Newsom*, No. EDCV20755JGBKKX, 2020 WL 1979970 (C.D. Cal. Apr. 23, 2020); *Whitsitt v. Newsom*, No. 220CV00691JAMCKDPS, 2020

26  WL 5944195 (E.D. Cal. Oct. 7, 2020); *Calvary Chapel San Jose v. Cody*, No. 20-CV-03794-BLF, 2020 WL 6508565 (N.D. Cal. Nov. 5, 2020).

27  Case No.: 5:20-cv-08241-EJD

28  ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

United States District Court<br>Northern District of California

1  treatment." *Id.*  For example, "a large store in Brooklyn . . . could literally have hundreds of

2  people shopping there on any given day," whereas "a nearby church or synagogue would be

3  prohibited from allowing more than 10 or 25 people inside for worship service." *Id.* at 67.  The

4  Court held that this "disparate treatment" of religion rendered the COVID-19 restrictions in the

5  order not neutral or generally applicable.  *Id.*  Thus, the Court applied strict scrutiny.

6       Applying strict scrutiny, the Court held that "[s]temming the spread of COVID-19 is

7  unquestionably a compelling interest," but concluded the challenged order was not narrowly

8  tailored.  *Id.*  The Court reasoned that there was no evidence that the two houses of worship had

9  contributed to the spread of COVID-19 and that "there were many other less restrictive rules that

10  could be adopted to minimize the risk to those attending religious services." *Id.*  The Court

11  emphasized that the New York Order was "far more severe than has been shown to be required to

12  prevent the spread of the virus," and suggested that as an alternative, New York could have tied

13  maximum attendance at a religious service "to the size of the church or synagogue." *Id.*  Because

14  the COVID-19 restrictions in the New York Order did not survive strict scrutiny the Court granted

15  the requested injunction pending appeal.

16              **ii.    *Calvary Chapel Dayton Valley v. Sisolak***

17       On December 15, 2020, the Ninth Circuit issued a published decision reversing a district

18  court's denial of a preliminary injunction to bar enforcement of a Nevada public health order.

19  *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1233 (9th Cir. 2020) ("*Dayton Valley*").

20  The Ninth Circuit held that *Roman Catholic Diocese* compelled strict scrutiny review of Nevada's

21  public health directive, which imposed a fifty-person capacity limit on houses of worship but a

22  50% capacity limit on certain other businesses ("Nevada Order"). *Id.* at 1232.  The panel wrote

23  that *Roman Catholic Diocese* "arguably represented a seismic shift in Free Exercise law." *Id.*

24  Explaining that the Nevada Order "treats numerous secular activities and entities significantly

25  better than religious worship services" including "[c]asinos, bowling alleys, retail businesses,

26  restaurants, arcades," leading to "the same 'disparate treatment' of religion" as the New York

27  Case No.: 5:20-cv-08241-EJD

28  ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

Order.  *Id.* at 1233.  Thus, the Ninth Circuit applied strict scrutiny.  The court found that Nevada held a compelling interest in slowing the spread of COVID-19 but concluded that the directive was not narrowly tailored to the compelling interest "because, for example, 'maximum attendance at a religious service could be tied to the size of the [house of worship].'"  *Id.* at 1234. (citing *Roman Catholic Diocese*, 141 S. Ct. at 66-67).

### v. *South Bay United Pentecostal Church v. Newsom*

The South Bay United Pentecostal Church first requested a preliminary injunction against the State Orders in May 2020.  After that request was denied, the church sought emergency relief from the Ninth Circuit and then the Supreme Court.  The Supreme Court denied the church's application for relief, *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 207 L. Ed. 2d 154 (2020), and remanded to the district court, where injunctive relief was once again denied.  *South Bay United Pentecostal Church v. Newsom*, No. 20-CV-00865-BAS-AHG, 2020 WL 7488974 (S.D. Cal. Dec. 21, 2020).

On January 22, 2021, the Ninth Circuit published its opinion affirming the district court's denial of the preliminary injunction.  *South Bay United Pentecostal Church v. Newsom*, No. 20-56358, 2021 WL 222814 (9th Cir. Jan. 22, 2021) (*South Bay*).  The Ninth Circuit considered the State Orders at issue in this case and much of the same evidence presented by the State.  The court concluded that under the standards set forth in *Roman Catholic Diocese* and *Dayton Valley*, the State Orders were subject to a strict scrutiny review.  After a careful examination of the State's justification for each restriction on worship services, the Ninth Circuit determined that "given the contagiousness of this deadly virus and the dire circumstances facing Southern California's healthcare system at this moment in its history," the prohibition on indoor worship services was Constitutional because "there exist no less restrictive means to alleviate the situation."  *South Bay*, 2021 WL 222814, at \*16.  In contrast, the court found that the 100- and 200-person limits on capacity at worship services in Tiers 2 and 3 of the Blueprint were not narrowly tailored, and the plaintiff was therefore likely to succeed on its Free Exercise challenge to those specific

1    restrictions. *Id.* at *18.  Finally, the court found that the State's separate ban on indoor singing

2    and chanting was subject only to a rational basis review, which it was likely to survive. *Id.*  Thus,

3    the court affirmed the district courts denial of a preliminary injunction but remanded with

4    instructions for the district court to enjoin the numerical limits on capacity.

5                    *vi.*    ***Harvest Rock Church v. Newsom***

6        Following *Roman Catholic Diocese*, the Supreme Court declined to consider a similar

7    application for emergency relief from a California church, Harvest Rock.  Instead, the Supreme

8    Court remanded the case to the district court for further consideration in light of *Roman Catholic*

9    *Diocese*.  *Harvest Rock Church v. Newsom, Gov. of CA*, No. 20A94, 2020 WL 7061630, at *1

10   (U.S. Dec. 3, 2020).  The district court denied the requested preliminary injunction, finding that

11   the Blueprint was neutral and generally applicable.  *Harvest Rock Church, Inc. v. Newsom*, No.

12   EDCV206414JGBKKX, 2020 WL 7639584, at *6 (C.D. Cal. Dec. 21, 2020).  The court further

13   found that the Blueprint would nevertheless survive strict scrutiny because it was "painstakingly

14   tailored to address the risks of Covid-19 transmission specifically." *Id.*

15       Harvest Rock Church sought an emergency injunction pending appeal at the Ninth Circuit.

16   On January 25, 2021, in accordance with its decision in *South Bay*, the Ninth Circuit granted the

17   preliminary injunction as to the fixed 100- and 200-person capacity limitations on indoor worship

18   services in Tiers 2 and 3 of the Blueprint, but denied the injunction in all other respects.  *Harvest*

19   *Rock Church, Inc. v. Newsom*, No. 20-56357, 2021 WL 287832, at *2 (9th Cir. Jan. 25, 2021).  In

20   a concurring opinion, Judge O'Scannlain acknowledged that the outcome was warranted under

21   *South Bay* but expressed strong disagreement with the court's decision in *South Bay*. *Id.* at *2-4

22   (O'Scannlain, J., concurring).

23   **II.**    **Legal Standard**

24       The Supreme Court has emphasized that preliminary injunctions are an "extraordinary

25   remedy never awarded as of right." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015)

26   (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249

27

28   Case No.: 5:20-cv-08241-EJD
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

United States District Court
Northern District of California

1    (2008).  To secure a preliminary injunction Plaintiffs must make a clear showing that (1) they are

2    likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of

3    preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public

4    interest.  *Winter*, 555 U.S. at 20–22.  In the Ninth Circuit, the first element may also be met where

5    there are "'serious questions going to the merits' and a hardship balance that tips sharply towards

6    the plaintiff [which] can support issuance of a preliminary injunction, so long as the plaintiff also

7    shows that there is a likelihood of irreparable injury and that the injunction is in the public

8    interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

9    **III.    Discussion**

10        Plaintiffs' Amended Complaint raises seven claims, however, their Preliminary Injunction

11   Motion only argues the merits of their First Amendment Free Exercise claim (Claim Two).

12              **a.   Likelihood of Success on the Merits as to the State Orders**

13       "The first factor under *Winter* is the most important—likely success on the merits."

14   *Garcia*, 786 F.3d at 740 (citing *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) ("We

15   begin with the first and most important factor: whether petitioners have established a likelihood of

16   success on the merits.")).

17       "The Free Exercise Clause of the First Amendment, which has been made applicable to the

18   States by incorporation into the Fourteenth Amendment . . . provides that 'Congress shall make no

19   law respecting an establishment of religion, or prohibiting the free exercise thereof[.]'"

20   *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 876–77, 110 S. Ct.

21   1595, 108 L. Ed. 2d 876 (1990) (internal citations and emphasis omitted).  In determining whether

22   a law prohibits the free exercise of religion, courts first ask whether the law "is neutral and of

23   general applicability."  *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 531 (citing

24   *Employment Div., Dept. of Human Resources of Oregon*, 494 U.S. at 879).  If it is, then the law

25   need only survive rational basis review—even if it "has the incidental effect of burdening a

26   particular religious practice."  *Id.*  If a law is not neutral and generally applicable, the law must

27

28   Case No.: 5:20-cv-08241-EJD
     ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
     PRELIMINARY INJUNCTION

13

United States District Court
Northern District of California

survive strict scrutiny review.  *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. 520.

### i.  Level of Scrutiny

The first step in the analysis is to determine whether the State Orders are neutral and generally applicable, or whether "the object of a law is to infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 533. Traditionally, under *Lukumi*, courts determine whether a law is "neutral and of general applicability," by considering whether the law treats religious conduct less favorably than "analogous non-religious conduct." *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 531–32, 546; *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1079 (9th Cir. 2015) (examining "comparable secular conduct").

In *Roman Catholic Diocese*, the Supreme Court found that New York's orders "cannot be viewed as neutral because they single out houses of worship for especially harsh treatment." *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 66.  The Supreme Court explained:

> In a red zone, while a synagogue or church may not admit more than 10 persons, businesses categorized as "essential" may admit as many people as they wish. And the list of "essential" businesses includes things such as acupuncture facilities, camp grounds, garages, as well as many whose services are not limited to those that can be regarded as essential, such as all plants manufacturing chemicals and microelectronics and all transportation facilities. . . . The disparate treatment is even more striking in an orange zone. While attendance at houses of worship is limited to 25 persons, even non-essential businesses may decide for themselves how many persons to admit.
>
> These categorizations lead to troubling results. At the hearing in the District Court, a health department official testified about a large store in Brooklyn that could "literally have hundreds of people shopping there on any given day." . . . Yet a nearby church or synagogue would be prohibited from allowing more than 10 or 25 people inside for a worship service. And the Governor has stated that factories and schools have contributed to the spread of COVID–19, . . . but they are treated less harshly than the Diocese's churches and Agudath Israel's synagogues, which have admirable safety records.

*Id.* at 66–67.  Thus, in determining whether the New York Orders were neutral and generally applicable, the Supreme Court did not specifically consider whether houses of worship were

United States District Court
Northern District of California

treated less favorably than analogous secular facilities.  Rather, the Supreme Court emphasized the

disparate treatment of non-analogous places such as campgrounds, garages, manufacturing plants,

and all transportation facilities.  The per curium opinion did not elaborate on these points of

comparison, however, Justice Kavanaugh's concurring opinion succinctly captures the approach

the Court appeared to take.  He writes:

> "[U]nder this Court's precedents, it does not suffice for a State to point out
> that, as compared to houses of worship, *some* secular businesses are subject
> to similarly severe or even more severe restrictions. . . . Rather, once a State
> creates a favored class of businesses, as New York has done in this case, the
> State must justify why houses of worship are excluded from that favored
> class."

*Id.* at 73 (Kavanaugh, J., concurring); *see also Calvary Chapel Dayton Valley v. Sisolak*, 140 S.

Ct. 2603, 2613, 207 L. Ed. 2d 1129 (2020) (Kavanaugh, J., dissenting) ("The point is not whether

one or a few secular analogs are regulated.  The question is whether a single secular analog is not

regulated.").

In *Dayton Valley*, the Ninth Circuit noted that the Supreme Court's approach in *Roman*

*Catholic Diocese* "arguably represented a seismic shift in Free Exercise law."  *Dayton Valley*, 982

F.3d at 1232.  In evaluating Nevada's public health restrictions on places of worship, the panel

held that *Roman Catholic Diocese* compelled the application of strict scrutiny because "[j]ust like

the New York restrictions, the Directive treats *numerous secular activities and entities*

significantly better than religious worship services."  *Id.* (emphasis added).  Notably, the panel

dropped the "comparable" or "analogous" requirement.  *Cf. Church of the Lukumi Babalu Aye,*

*Inc.*, 508 U.S. at 531–32, 546 (considering whether the law treats religious conduct less favorably

than "*analogous* non-religious conduct") (emphasis added); *Stormans, Inc.*, 794 F.3d at 1079

(examining "*comparable* secular conduct") (emphasis added).  The Ninth Circuit instead pointed

to "[c]asinos, bowling alleys, retail businesses, restaurants, arcades, and other similar secular

entities," which were allowed to operate at a higher capacity than houses of worship.  As a result,

the panel found the Nevada restrictions created the same disparate treatment of religion as the

United States District Court
Northern District of California

New York Orders, triggering strict scrutiny review.

Similarly, in *South Bay*, the Ninth Circuit explained that *Roman Catholic Diocese* compels courts to apply strict scrutiny "whenever a state imposes different capacity restrictions on religious services relative to non-religious activities and sectors. *South Bay*, 2021 WL 222814, at *8 (citing *Roman Catholic Diocese*, 141 S. Ct. at 66–67). Both the Regional Order and the Blueprint were at issue in *South Bay*. The court explained that "the restrictions do permit grocery stores and retail establishments to operate at 35% and 20% of capacity, respectively, under the Regional Stay at Home Order and at 50% and 25% of capacity, respectively, under Tier 1 of the Blueprint. Tier 1 also permits certain personal care services, such as hair and nail salons, to open indoors subject to additional modifications and strict industry guidance." The court concluded that given these lesser restrictions on secular activities, the total prohibition of indoor worship constitutes "'disparate treatment' of religion [and] triggers strict scrutiny review." *Id.* at *9 (citing *Dayton Valley*, 982 F.3d at 1233).[5] Pursuant to *South Bay*, *Dayton Valley*, and the Ninth Circuit's application of *Roman Catholic Diocese*, this Court holds that the State Orders are subject to strict scrutiny.

To satisfy strict scrutiny, the State must demonstrate that the State Orders are "'narrowly tailored' to serve a 'compelling' state interest." *Roman Catholic Diocese*, 141 S. Ct. at 67 (quoting *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 546). Although strict scrutiny imposes a high bar, courts have "upheld laws—even under strict scrutiny." *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449, 135 S. Ct. 1656, 191 L. Ed. 2d 570 (2015) (collecting cases).

---

[5] In finding that strict scrutiny applies, the panel noted that they found "no record evidence of animus toward religious groups" by the state. *South Bay*, 2021 WL 222814, at *9, n.21; *cf. Roman Catholic Diocese*, 141 S. Ct. at 66 (noting "a variety of remarks made by the Governor" that the restrictions were intended to "specifically target[] the Orthodox Jewish community"). This Court likewise finds no evidence of animus by the State or County in the extensive record before it. Indeed, Plaintiffs do not argue that the State or County demonstrated animosity towards religion, rather, they argue that strict scrutiny applies even in the absence of animosity. Mot. at 6-7 (citing *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020) ("The constitutional benchmark is 'government neutrality,' not 'governmental avoidance of bigotry.")); *see also Roman Catholic Diocese*, 141 S. Ct. at 66 ("even if we put those [hostile] statements aside, the regulations cannot be viewed as neutral because they single out houses of worship for especially harsh treatment").

Case No.: 5:20-cv-08241-EJD
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

United States District Court
Northern District of California

### ii.   Compelling Government Interest

The Supreme Court expressly held that "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Catholic Diocese*, 141 S. Ct. at 68.  The Ninth Circuit held the same.  *South Bay*, 2021 WL 222814, at *10 (concluding, over plaintiff's objections, that "California has a compelling interest in reducing community spread of COVID-19"); *Dayton Valley*, 982 F.3d at 1234 ("though slowing the spread of COVID-19 is a compelling interest, the [Nevada Order] is not narrowly tailored to serve that interest.").  Moreover, although Plaintiffs make an argument that the situation is no longer one of exigency, they also concede that "[s]lowing the spread of COVID-19 certainly qualifies as a compelling interest."  Motion at 13.  Thus, the likelihood of success of Plaintiffs' Free Exercise claim turns on whether the State can demonstrate that its restrictions on places of worship are narrowly tailored to achieve this compelling interest.

### iii.   Narrow Tailoring

In order to show that the restrictions on indoor worship are narrowly tailored, the State must show that they are "the least restrictive means of achieving some compelling state interest." *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981).

### 1.   Prohibition of indoor worship

The State argues that the restrictions on places of worship in the State Orders, including the prohibition of indoor worship under Tier 1 and the Regional Order, are narrowly tailored to stem the spread of COVID-19 because they are based on objective data and a science-driven risk assessment process.  Specifically, the risk associated with each activity listed in the Blueprint was evaluated according to seven risk factors focused on the method by which the virus is transmitted. *South Bay*, 2021 WL 222814, at *10.  These factors are: (1) ability to accommodate wearing masks at all times; (2) ability to allow physical distancing; (3) ability to limit the duration of exposure; (4) ability to limit the amount of mixing of people from differing households and

United States District Court
Northern District of California

United States District Court
Northern District of California

1   communities; (5) ability to limit the amount of physical interactions of visitors/patrons; (6) ability

2   to optimize ventilation; and (7) ability to limit activities that are known to cause increased spread.

3   According to the State, these factors are based on a scientific understanding of the way the

4   virus is transmitted, including the fact that "viral load"—the amount of virus a person is exposed

5   to during any given activity—affects how likely a person is to become infected and to become ill.

6   This means that the length and concentration of a person's exposure to the virus matters.  In light

7   of that understanding, the State carefully crafted the risk factors laid out above and used those

8   factors to assess the risk of transmission associated with various activities.  In doing so, the State

9   determined that indoor worship services pose an enormous risk of transmission because they bring

10  a large group of people together to sit near one another in the same space for an extended period of

11  time, indoors, where air flow is limited, with socializing, singing, chanting and other conduct that

12  increases transmission risk.  Watt Decl. ¶¶ 38, 53, 70 99; Rutherford Decl. ¶¶ 90-94, 106.  These

13  characteristics of indoor worship services increase the viral load that a person might be exposed to

14  during the activity, which in turn increases the risk of infection and illness.  The risky nature of

15  worship services can be alleviated, in part, by increasing ventilation, which is why the State

16  Orders permit worship services outdoors.

17  State health experts determined that indoor worship services were riskier than shopping at

18  retail or grocery stores, both of which are treated more favorably under the State Orders, because

19  people tend to move quickly through retail and grocery stores and are less likely to interact with

20  people outside of their households.  Rutherford Decl. ¶¶ 112-18.  These differences meaningfully

21  decrease the viral load a shopper might be exposed to, which makes the activity significantly less

22  risky.  *Id.* at 112, 116.  Other activities, such as personal care services, are less risky because

23  although they "may bring together people in close contact with one another, they involve small

24  numbers of individuals interacting, in contrast to the numbers of individuals commonly present at

25  indoor worship services.  *South Bay*, 2021 WL 222814, at *12 (internal quotations omitted).

26  Moreover, personal care services are more easily subject to additional mandatory hygienic

27

28  ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

1  requirements—*e.g.*, a mandatory secondary barrier in addition to a face mask—that further

2  decrease risk.  The number of people and nature of worship services make these more burdensome

3  requirements impractical.

4       In *South Bay*, both the district court and the Ninth Circuit carefully examined the State's

5  application of its seven risk factors to the sectors and activities that are subject to lesser restrictions

6  than places of worship.  *Id.* at *11-13.  The district court held, and the Ninth Circuit affirmed, that

7  the State's risk assessment of each activity justified the restrictions applied to each activity.

8  Specifically, the Ninth Circuit found that the State "tailored its 'restrictions to the specific

9  mechanism of Covid-19 transmission: viral droplets which travel through the air from person to

10  person.'"  *Id.* at *15 (quoting *Harvest Rock Church, Inc.*, 2020 WL 7639584, at *7).

11       The *South Bay* court distinguished the State Orders from the restrictions at issue in *Roman*

12  *Catholic Diocese* and *Dayton Valley*, finding that the State Orders were not "especially harsh"

13  toward religion.  *Id.* at *15.  On the contrary, the State's "objective risk assessment treats all

14  communal gatherings the same across activities and sectors."  *Id.*  Indeed, the Supreme Court itself

15  described the New York Order as "far more restrictive" than a previous iteration of the State

16  restrictions, which have been incorporated into Tier 2 of the Blueprint.  *Roman Catholic Diocese*,

17  141 S. Ct. at 67 n.2 (citing *South Bay United Pentecostal Church*, 140 S. Ct. 1613); *see also id.* at

18  74 (Kavanaugh, J., concurring) ("New York's restrictions on houses of worship are much more

19  severe than the California and Nevada restrictions at issue in *South Bay* and [*Dayton Valley*] . . .

20  ."); *id.* at 75 (Roberts, C.J., dissenting) (observing that the New York restrictions are

21  "distinguishable from those we considered in [*South Bay*]").

22       Plaintiffs primarily argue that the State's proffered justification for its prohibition of indoor

23  worship is undermined by the fact that the State Orders completely fail to restrict similarly risky

24  activity.  Plaintiffs focus on airport gates as an example of an unregulated, similarly risk activity.

25  They argue that airport gates present substantially similar risk to indoor worship services because

26  people at airport gates gather in large groups, sit near each other, in rows, for extended periods of

27

28  Case No.: 5:20-cv-08241-EJD
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

United States District Court
Northern District of California

United States District Court
Northern District of California

1    time while waiting for their flight.  Yet, airports are not subject to *any* restrictions under the State

2    Orders, let alone the strict capacity limitations or prohibition on indoor operations that places of

3    worship are subject to.  Plaintiffs, therefore, specifically request that they be allowed to resume

4    indoor operations to the same extent as airports.

5            In response, the State first argues that the comparison fails because federal law preempts

6    state regulation of airports and air travel, and therefore, the State does not have the power to

7    regulate airports in the same way it regulates other activities.  Opposition at 15 (citing *Montalvo v.*

8    *Spirit Airlines*, 508 F.3d 464, 468 (9th Cir. 2007) ("the FAA preempts the entire field of aviation

9    safety through implied field preemption")).  Whether and the extent to which hypothetical

10   restrictions at airports, such as capacity limitations or social distancing, would be preempted by

11   federal law is outside the scope of this motion.  Suffice it to say that the federal government does

12   not categorically prohibit local governments from imposing public health ordinances on airports;

13   rather, it has indicated that any such measures must be approved by the FAA.  *See* Grabarsky

14   Decl. Ex. 51 (stating that "all proposed closing of airport access," "closing of gates or sections of

15   terminals," and "screening or quarantining of passengers" among other restrictions must be

16   approved by and coordinated with the FAA).  It does not follow that the State and County cannot

17   impose *any* public health measures on airports at all.  Thus, the possibility that measures taken

18   without FAA approval might be preempted does not, in itself, explain the difference in treatment

19   of airports and places of worship.

20           The State next argues that airport gates are not comparable to indoor worship services

21   because they pose a lesser risk of transmission.  Airports like the Norman Y. Mineta San Jose

22   International Airport are immense facilities with efficient airflow and ventilation systems and are

23   subject to a host of federal rules and regulations not applicable or feasible for places of worship,

24   all of which greatly lower transmission risk.  Rutherford Decl. ¶¶ 105, 123-29; Grabarsky Decl.

25   Exs. 56-57.  Unlike at worship services, people in airports typically do not interact with members

26   of other households, carry on social conversations, sit in one place for an hour or more, or engage

in singing, chanting, or other activities that increase viral exposure.  *See South Bay*, 2021 WL

222814, at *13 ("unlike worship services, interactions in a transit setting are likely to be asocial,

brief and distant . . . Furthermore, chanting or yelling is uncommon—perhaps even alarming—in

these environments").

Plaintiffs' assertion that "[t]he reality of gatherings at airport gates is that they are quite

social with tremendous interaction," is entirely anecdotal and speculative.  Reply at 13.  On the

other hand, the State's characterization of behavior at worship services—*i.e.*, that it is inherently

social and interactive—is supported by countless declarations from Plaintiffs' pastors and

personnel.  *See, e.g.*, Decl. Jonathan Reynolds Support ¶ 11 ("Our services at GCC are spiritual

events, but also very social.  Our people love to gather, greet each other, and enjoy the company of

each other as they worship, pray, and hear a message.  Our services consist of times of corporate

singing and prayers").[6]  As these declarations make clear, the fellowship of worshipping together

is central to the practice of Plaintiffs' faith and the absence of such fellowship has undeniably

caused harm to individuals and communities of Plaintiffs' faith.  But it is, in part, this social aspect

of worship that distinguishes worship services from airport gates in a way that makes worship

services substantially riskier activities.

Plaintiffs further contend that the total prohibition of indoor worship under the Regional

Order and Tier 1 of the Blueprint is overinclusive because it prohibits more activity than necessary

---

[6] *See also* Declaration of Rev. George Kistler ¶ 7 ("God has created humans as social beings, . . . we must be able to meet together in person with real human interaction.  We must be able to freely exercise our religious expression and have interaction with our God together through our worship, which must include singing."); Declaration of Rev. Cobb ¶ 27 ("it is imperative that we gather as a church body to fellowship, worship and connect relationally. . . . It is only through gathering as a church body can we experience the benefits of receiving teaching on moral Biblical truths, encouragement by physical connection, [and] singing as a group which release the soul to a state of peace and joy."); Declaration of Rev. Hector Moreno ¶ 66 ("Worship services are participatory responsive gatherings where people actively 'come before his presence with singing' and 'enter into his gates with thanksgiving,' worshipping the Lord together, in songs of praise, songs of thanksgiving, songs of joy, new songs, and songs in the Spirit . . . God's people worship, speak, inquire, teach and hear the word of God together, and partake of the sacraments together of communion . . . people assemble for fellowship and breaking bread and for prayer"); Declaration of Dr. Samuel ¶ 36 ("Worship[] services are vital to the social and spiritual health."); Declaration of Rev. Todd Burgett ¶ 55 (same).

to prevent the spread of COVID-19.  Plaintiffs argue that "[s]ocial distancing, masks, and hand washing will protect congregants from exposure to the virus."  Mot. at 8.  The State's health officials concluded that these measures are "good . . . but insufficient" to reduce community transmission.  Watt Decl. ¶¶ 100-01.  In support of their assertion that lesser protective measures would suffice, Plaintiffs rely on their own observations that none of the Plaintiff churches experienced an outbreak nor "contributed to the spread of COVID-19" when they were operating indoor worship and taking these basic safety precautions.  Reply at 3.  Because of the reality that the virus may transmit through asymptomatic individuals, the Court does not find Plaintiffs' observations reliable or compelling.  *See South Bay*, 2021 WL 222814, at *14 (finding that plaintiff's "self-serving assertion that it has experienced no incidence of the virus among its worshipers is entirely anecdotal and undermined by evidence of outbreaks in similarly situated places of worship.").

Plaintiffs also rely on the Declaration of Dr. Jayanta Bhattacharya, a Professor of Medicine at Stanford University, who recommends that public health officials adopt an approach of "focused protection of those at higher risk of serious injury instead of shutting down society." Dkt. No. 50-24, Declaration of Dr. Jayanta Bhattacharya In Support Of Plaintiffs' Ex Parte Application For Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue Against Defendants ("Bhattacharya Decl.") ¶ 4.  According to this theory, the State does more harm by imposing harsh lockdown measures than would be done by allowing COVID-19 to spread freely because only a minority of those who contract COVID-19 become seriously ill or die.  *Id.; see generally*, The Great Barrington Declaration, Plaintiffs' Ex. 98.  Dr. Bhattacharya opines that given the very high infection survival rate of most age groups, the public health benefits of worship services outweigh the public health risks of transmission. Bhattacharya Decl. ¶¶ 45-49.  As an initial matter, the Court is not persuaded by Dr. Bhattacharya's focus on infection survival rates, considering that many individuals who survive COVID-19 suffer serious long-term side effects and many others experience significant suffering

1 | before recovering.  Watt Decl. ¶¶ 21-23.  Preventing suffering and long-term side-effects are
2 | legitimate public health benefits not taken into account in Dr. Bhattacharya's approach.

3 |       More fundamentally, Dr. Bhattacharya does not contradict any of the State's evidence or
4 | conclusions regarding viral transmission, rather, he questions the wisdom of restricting activities
5 | based on transmission risk without considering the countervailing benefits of those activities.  *Id.* ¶
6 | 39.  Regardless of the merits of Dr. Bhattacharya's critique, this cost-benefit analysis is a matter of
7 | public policy.  Courts have recently and consistently reiterated that matters of public health policy
8 | are best left to politically accountable public health officials, not the courts.  *See Roman Catholic*
9 | *Diocese*, 141 S. Ct. at 74 (Kavanaugh, J., concurring) ("Federal courts [] must afford substantial
10 | deference to state and local authorities about how best to balance competing policy considerations
11 | during] the pandemic."); *id.*, at *3 ("Members of this Court are not public health experts, and we
12 | should respect the judgment of those with special expertise and responsibility in this area.");
13 | *Dayton Valley*, 982 F.3d at 1232 n.3 (same); *South Bay*, 2021 WL 222814, at *14 ("[W]hile some
14 | may disagree with the local public health officials' assessments of what constitutes comparable
15 | activities based on the seven risk factors, . . . such risk assessment—which necessarily reflects the
16 | local climate, infrastructure, and public health outcomes of prior policies—is a question of policy-
17 | making better deferred to the local public health officials.").  This deference is particularly
18 | important where there is disagreement in the scientific community.  As Chief Justice Roberts
19 | explained in his concurring opinion to the denial of emergency relief in *South Bay*:

20 |         When [politically accountable] officials "undertake[ ] to act in areas fraught
21 |         with medical and scientific uncertainties," their latitude "must be especially
   |         broad."  *Marshall v. United States*, 414 U.S. 417, 427 (1974).  Where those
22 |         broad limits are not exceeded, they should not be subject to second-guessing
   |         by an "unelected federal judiciary," which lacks the background,
23 |         competence, and expertise to assess public health and is not accountable to
24 |         the people.

25 | *South Bay United Pentecostal Church*, 140 S. Ct. at 1613–14 (Roberts, C.J., concurring) (citations
26 | omitted and altered).

27

United States District Court
Northern District of California

In the context of a dynamic and unprecedent pandemic, this Court is satisfied that "California did exactly what the narrow tailoring requirement mandates—that is, California has carefully designed the different exemptions to match its goal of reducing community spread, based on a neutral, seven-factor risk analysis." *South Bay United Pentecostal Church*, 2020 WL 7488974, at *11; *see also Harvest Rock Church, Inc.*, 2020 WL 7639584, at *9 ("[i]f 'narrowly tailored' does not mean based on the specific mechanism of Covid-19 infection with sliding levels of restriction based on scientific likelihood of viral spread in any given scenario, it means nothing.").

## 2. Numerical Capacity Restrictions

Although the prohibition of indoor worship currently in effect under Tier 1 of the Blueprint (and previously in effect under the Regional Order) survives strict scrutiny, the Court must also consider the restrictions imposed under Tiers 2, 3, and 4 of the Blueprint that will go into effect as the infection rate in the county decreases. Specifically, the State must also justify its imposition of a 25% or 100-person (whichever is fewer) capacity limitation on places of worship in Tier 2 and a 50% or 200-person capacity limitation in Tier 3, when certain secular activities are not similarly subject to a fixed capacity limitation. The Ninth Circuit considered this question in *South Bay*:

> Whereas the State has submitted substantial evidence as to why indoor worship is unsafe at any level in counties where COVID-19 is "widespread" and ICU capacity is non-existent, we cannot find record evidence to support its assertion that the 100-person cap in Tier 2 and 200-person cap in Tier 3 are necessary to achieve its goal in further slowing community spread. As in *Roman Catholic Diocese*, "there are many other less restrictive rules that could be adopted to minimize the risk to those attending religious services." . . . And while 100 or 200 people could overwhelm a small chapel, a large church the size of South Bay could easily implement social distancing with much higher numbers. Accordingly, we conclude that South Bay is likely to succeed on the merits of its Free Exercise claim with respect to the numerical caps in Tiers 2 and 3."

*South Bay*, 2021 WL 222814, at *18 (citations omitted).

As in *South Bay*, the State in this case has not shown any scientific basis for why the transmission risk would increase with over 100 people present regardless of the size of the church.

1  Nor have they explained why less restrictive measures, such as the percentage caps alone, would

2  cause any greater peril to the public.  Thus, the Court finds that the 100- and 200-person

3  limitations under Tiers 2 and 3 of the Blueprint are not narrowly tailored to serve a compelling

4  interest and Plaintiffs are likely to succeed on the merits of this portion of their claim.

### 3.  Restrictions on "Places of Worship"

5

6  The State Orders mandate that in Tier 1 of the Blueprint and under the Regional Order,

7  "places of worship" may operate "outdoor only with modifications."  Blueprint, Plaintiffs' Ex. 27.

8  As discussed above, the State has presented compelling evidence that a prohibition on indoor

9  *worship services* is narrowly tailored, however, Plaintiffs contend that the restriction prohibits all

10  other activities at places of worship as well.  Plaintiffs maintain that "not one pastor could

11  assemble with one parishioner in any church" while subject to Tier 1 or Regional Order

12  restrictions.  Amended Complaint ¶ 8.

13  At the preliminary injunction hearing on January 15, 2021, the State insisted that "what the

14  State's orders address are worship services . . . it's not true that all houses of worship are

15  shuttered, . . . the state isn't regulating building by building, rather it's the activity that occurs in

16  any building [that is prohibited]."  Transcript, Dkt. No. 62, at 34:20-25:6.  Despite the State's

17  assurances, the Court finds that the restriction as written is not limited to worship services.  On its

18  face, the phrase "places of worship" refers to the buildings, facilities, or locations where worship

19  occurs, not the activity of worshipping.  The State has not offered and the Court is not aware of

20  any guidance or order from the State indicating that "places of worship" are free to operate indoors

21  for purposes other than worship services.  The Court, therefore, agrees with Plaintiffs'

22  interpretation of the State Orders as prohibiting even one parishioner from entering his or her

23  place of worship for any purpose, including solitary prayer, confession, or making an offering.

24  The Court further finds that this overinclusive drafting results in restrictions on the free

25  exercise of religion that are not narrowly tailored to combatting COVID-19.  The State's

26  justification for the restrictions on places of worship pertain solely to worship services.  The risks

27

28
Case No.: 5:20-cv-08241-EJD
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

United States District Court
Northern District of California

1    associated with people of separate households gathering in close proximity for extended periods of

2    time, or involved in singing or chanting, are not present when individual parishioners, or even

3    multiple members of the same household, enter a place of worship for a purpose other than

4    attending a worship service.  When not attending worship services, people are likely to move

5    through places of worship in a manner similar to the way they move through retail stores or

6    grocery stores.  To the extent individual parishioners interact with clergy, those interactions likely

7    involve no more risk than certain personal care services, and that risk could be mitigated in similar

8    ways.  Thus, the Court finds that Plaintiffs are likely to succeed on their Free Exercise claim to the

9    extent that the State Orders restrict activity at places of worship other than worship services.

**b.  Likelihood of Success on the Merits as to the County Orders**

11    Although the Ninth Circuit's express holding in *South Bay* and the standard set forth in

12    *Dayton Valley*, compel a strict scrutiny review of the State Orders, neither of those courts had

13    reason to consider the County Orders at issue in this case.  Thus, this Court must first consider

14    what level of scrutiny applies to the County Orders.

15    Unlike the State Orders, the County Orders do not impose any express restrictions on

16    "places of worship."  Rather, the County Orders regulate "gatherings" generally.  *See* Capacity

17    Directive, Plaintiffs' Ex. 147.  Specifically, the current version of the Capacity Directive states

18    that indoor operation is "prohibited" for "Gatherings (e.g., political events, weddings, funerals,

19    worship services, movie showings, cardroom operations)."  Revised Capacity Directive.  In the

20    County's Mandatory Directive on Gatherings, a gathering is defined as "an event, assembly,

21    meeting, or convening that brings together multiple people from separate households in a single

22    space, indoors or outdoors, at the same time and in a coordinated fashion—like a wedding,

23    banquet, conference, religious service, festival, fair, party, performance, movie theater operation,

24    barbecue, protest, or picnic."  *See* Gatherings Directive, Kieschnick Ex. J at 1.  Apart from the

25    gatherings that take place within them, places of worship themselves presumably fall into the

26    category of "Any Other Facility Allowed to Open to the Public Under State and Local Orders,"

27

United States District Court
Northern District of California

United States District Court
Northern District of California

1   which is subject to a 20% capacity limitation.  Revised Capacity Directive.[7]

2   Plaintiffs slightly mischaracterize the Capacity Directive.  Plaintiffs argue that "SCC's

3   Mandatory Directive on Capacity Limitations (Ex 147), states specifically that 'indoor operations

4   are prohibited' for places of worship."  Motion at 12.  It does not.  The Capacity Directive limits

5   gatherings of all types, which includes worship services.  Plaintiffs further argue that the Capacity

6   Directive is not neutral because it references "worship services" as an example of a gathering and

7   that laws "referenc[ing] . . . any religious practice, conduct, belief, or motivation" are not facially

8   neutral.  Motion at 15 (citing *Stormans, Inc.*, 794 F.3d at 1076).  The County argues that listing

9   worship services as one of many examples of activities captured by the definition of gatherings

10  does not evidence any discriminatory or even disparate treatment of worship services.  County

11  Opp. at 9 (citing *Gish*, 2020 WL 1979970, at *5 ("[F]acial neutrality does not require freedom

12  from any mention of religion.")).  On the contrary, the inclusion of worship services in a non-

13  exclusive list of both religious and secular activities demonstrates that all similar activities are

14  treated the same under the law.

15  As with the State Orders, Plaintiffs argue that the County restrictions on gatherings are

16  underinclusive because they do not reach groups of people at airport waiting gates.  For the

17  reasons stated above, this is unpersuasive.  Moreover, groups of people at airport gates do not

18  meet the definition of "gathering" because they do not "bring[] together multiple people from

19  separate households in a single space . . . at the same time and in a coordinated fashion."  *See*

20  Gatherings Directive at 1–2.  This definition of gatherings is entirely neutral toward religion.  The

21  capacity limitations are generally applicable to any gathering—religious or secular—that meets

22  the neutral definition.  In other words, worship services are not "single[d] out" nor are they subject

23  to "especially harsh treatment" under the County Orders.  *Cf. Roman Catholic Diocese*, 141 S. Ct.

24  at 66; *see also South Bay*, 2021 WL 222814, at *18 (holding that California's ban on indoor

25

26  [7] Under the previous version submitted by Plaintiffs, this category consists of "All Other Facilities
   (including Governmental Facilities)," in which "[a]ny indoor areas accessible to the public are
27  limited to 10% capacity."  Capacity Directive at 7.

Case No.: 5:20-cv-08241-EJD
28  ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
   PRELIMINARY INJUNCTION

1  singing and chanting was subject to deferential rational basis review because it "applies to all

2  indoor activities, sectors, and private gatherings" and there was no evidence that "this ban results

3  in disparate treatment of religious gatherings").  The Court, therefore, applies a rational basis

4  review of the County Orders.

5       The County Orders survive a rational basis review because they further the government's

6  interest in preventing community spread as well as protecting worshippers, the communities in

7  which they live, and the public in general.  As discussed above, gatherings of people from multiple

8  households, particularly indoors, carry a high risk of transmission.  Preventing people from

9  gathering indoors and limiting the number of people permitted to gather outdoors rationally

10  furthers the legitimate goal of slowing transmission of the virus.

11          **c.   Irreparable Harm**

12       It is well-settled that loss of First Amendment freedoms, for even minimal periods of time

13  "unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct.

14  2673, 49 L. Ed. 2d 547 (1976) (plurality opinion); *Roman Catholic Diocese*, 141 S. Ct. at *67

15  ("There can be no question that the challenged restrictions, if enforced, will cause irreparable

16  harm."); *South Bay*, 2021 WL 222814, at *16 (holding that plaintiff was "suffering irreparable

17  harm by not being able to hold worship services in the Pentecostal model to which it subscribes").

18          **d.   Balance of Equities and Public Interest**

19       Where the government is a party to a case in which a preliminary injunction is sought, the

20  balance of the equities and public interest factors merge.  *Drakes Bay Oyster Co. v. Jewell*, 747

21  F.3d 1073, 1092 (9th Cir. 2014)).

22       The COVID-19 pandemic continues to pose unprecedented risk to public health.  As the

23  rate of new infections in California has started to decline in recent weeks, the Regional Order was

24  lifted.  Nevertheless, most counties in the state, including Santa Clara County, are still in Tier 1 of

25  the Blueprint, meaning that the restrictions on worship services have remained the same.  If the

26  injunction is not granted, Plaintiffs will continue to be deprived of their ability to worship

27

28  ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

United States District Court
Northern District of California

collectively indoors.  Although the Court has found that this burden on their free exercise of religion is constitutional, the Court acknowledges that it is a heavy burden nevertheless.

On the other hand, if the injunction is granted large groups of congregants will undoubtedly gather for indoor worship services at Plaintiffs' churches.  Unlike in *Roman Catholic Diocese*, there is strong evidence to conclude that such gatherings would introduce significant risk of transmission and lead to avoidable infections and death in the community.  *See South Bay*, 2021 WL 222814, at *17 ("Indeed, it is difficult to see how allowing more people to congregate indoors will do anything other than lead to more cases, more deaths, and more strains on California's already overburdened healthcare system.").  As the Ninth Circuit explained,

> [E]ven if an individual congregant is willing to accept the risk of contracting the virus by partaking in such conduct, the risk is not an individual's risk to take.  The risk is also to the lives of others with whom an asymptomatic person may come into close contact, to the healthcare workers who must care for the person one infects, and to California's overwhelmed healthcare system as a whole.

*Id.* at *15.

Given the significant risk to the general public associated with worship services at Plaintiffs' churches, the Court finds that the balance of equities and public interest favors denying the injunction.

## IV.  Conclusion

For the reasons stated, the Court GRANTS in part and DENIES in part Plaintiffs' motion for a preliminary injunction.  IT IS HEREBY ORDERED THAT:

1) The State is enjoined from enforcing the 100-person capacity limit applicable in Tier 2 of the Blueprint and the 200-person capacity limit applicable in Tier 3 of the Blueprint. This order shall not affect the State's ability to enforce the percentage-based capacity limitations applicable in any tier.

2) The State is enjoined from enforcing the Blueprint's restrictions on activities at places of worship other than worship services, except to the extent that it enforces such

United States District Court
Northern District of California

restrictions against secular businesses or activities.

3)  The preliminary injunction is denied in all other respects.

**IT IS SO ORDERED.**

Dated: January 29, 2021

_____
EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California